United States v. Vigil and Witzow. Are you going to divide up your time? Yes, Your Honor. Ken Julian, on behalf of Mr. Witzow, we're going to reserve as a side three minutes for rebuttal. I'm going to argue for nine minutes on the Brady, Giglio, and cross-examination issues. Ms. Chu is going to argue for four minutes on closing argument, that's the confession issue. And then Mr. Daugherty is going to argue on instructional error and a brutal violation that relates only to his client. Oh, boy, this is too hard for me. Nine, four, and then... Four. Four. That leaves, that's 17, that leaves three. Yes, Your Honor. Bingo. Okay. Keep track of your time because I'm afraid this is too hard for me. Thank you, Your Honor. May it please the Court, this is a case in which the... And you're representing? Mr. Witzow. Mr. Witzow. But both defendants with respect to these arguments. Okay, and you are Mr. Julian. Yes, sir. Okay, fire away. May it please the Court, this is a case in which the government did not play fair. From almost the beginning of the discovery process all the way through closing argument. And as a result, the two defendants who were convicted did not get a fair trial. And the very first error that I'd like to talk to the Court about is a classic Giglio error. They did not disclose prior to trial and prior to the cross-examination of their main cooperating witness that he had received a substantial benefit. That is, not being prosecuted on state charges that he head-butted a clerk at an airport. And we were never told that. And it almost matches up with the facts of Giglio, it's such an obvious error. Was that reduced to writing, that agreement? Your Honor, we don't know. We don't know, but I don't know if it was or if it wasn't. Okay. But the government doesn't dispute it as a fact. And without that fact, I think the Court will see in the record that our cross-examination of Mr. Gillis on this issue fell flat. And that caused a substantial prejudice. When we first questioned him, we asked him, did you get your charges dismissed as a result of cooperating with the FBI? And he said, I don't know that as a fact. Not really much of a cross. And then he came back in the second time, asked him again, and he said it was dismissed as part of the FBI ruse, which did not make any sense at all. And without that fact certain, we were unable to impeach Mr. Gillis with this basic impeachment information. What the government did disclose in the discovery, it looked like it could have been part of the ruse. It also could have been part of the plea agreement that Mr. Witzow seemingly had negotiated with the DA to dismiss in exchange for a DNA sample. And the facts that the government lists in their brief, that they told us that the case was dismissed, that they told us that Mr. Gillis was a cooperating witness, and they told us that the FBI and the DA were working together, that just doesn't get them there. And under Ben v. Lambert, and a bunch of... Why doesn't it get them there? Because that seems to me that you've got the pieces right there. Well, Your Honor... And if the witness doesn't tell you the truth, that's a different matter, but it seems to me that you had enough pieces to know what had happened. Well, Your Honor, the reason that we would submit that that doesn't get us there is that those three facts are also consistent with it being dismissed as part of a ruse. It's also consistent with it just being a deal in exchange for a DNA sample. It's also consistent with the possibility that there was a deal that they didn't disclose. So, it's not the law... And what do we know now with respect to whether or not there was a deal and what the deal was? We know, based upon... I think it was almost all the way through the government's case, DA Hess testified, and he testified that, yes, the state charges were in fact dismissed as a result of the cooperation. And could you have recalled the witness? Your Honor, we might have. We might have, but not with the same effect. You might have. My question was, could you have? And I think your answer is yes. You were not foreclosed from doing that? The district judge did not foreclose us from doing that. And did you request to recall him? We did not. Yeah, okay. We did not, Your Honor. Are you saying that you did not know that there had been this cooperation until the deputy district attorney testified? We knew that he was... And let me tell you why I'm asking this, because it appeared to me from opening statements by both defense counsel that you probably knew this. Your Honor, we, before a federal prosecutor, I suspected. Sure, sure, we suspected. And that's why we're very careful in opening about that. But we certainly did not know it. But I think under the Kujayan case and other cases, including Comstock, which was just decided in 2015, there's an affirmative duty here on the part of the government, and it's not up to us to guess and grope on cross-examination on something that should be a very clean cross that establishes a fact certain you received a benefit, sir. And if he goes sideways on that answer, we get to impeach him on that. I would concede that it's powerful cross-examination. I just was of the impression that you probably... So you're saying you suspected it, but you didn't know it was certainty. Sure. I think just like the Kujayan case, we guessed right. We ultimately guessed right on this. But that's not the place we're supposed to be starting from. We're supposed to be starting walking into court with a fact certain that we can... I could come in and impeach him with this fact. So let me come back to the you decided not to recall him. I would have thought that it would have been pretty powerful. You put him on the stand, you have a readback of what he previously said, and now you confront him with the agent's testimony and you say, you lied, didn't you? And what's he say? He says, well, yeah, I guess I did. I want to be real careful because I have a faint recollection in the record that actually when Mr. Gillis was dismissed, the judge asked us, are you releasing him? And of course, we didn't know this information. And I believe it's a faint recollection that we said yes. And he said, I think he said, I'm not going to bring him back. I think he may have said that to us. But you made no request to bring him back. That's correct. And now you have information that you claim once the agent testifies, you now have information that you said you previously didn't have. Correct. I would have thought, had you made that case to the judge saying, we did not know this until right now, we would like to recall that witness, I would have been astounded if the district judge would have said, well, I'm not going to let you do it. He may very well have been, Your Honor, but, you know, in my experience, that may not have been a very effective cross-examination. Mr. Julian, in your district, how does it work in terms of disclosure of Brady and Giglio materials? Is that covered in a preliminary scheduling order? You make a request. How do you do it down here? Good question, Your Honor. It's very informal. But normally this office is very good and up front about disclosing this stuff explicitly and early. Does the court mandate disclosure at a certain point in time? It doesn't because this district typically, the practice is usually pretty good. Are you required to make a written request for it, go through that step? I believe technically we are. In fact, I think in this district they give it automatically, but we did make a written request for it. We did. We did. And if I could move on to my next issue here is limitation on cross-examination. Cover that really quickly. There was kind of a disruption of the trial. This Gillis blurted out that he had been threatened the night before, and then the court took some testimony outside the presence of the jury under oath. And in that testimony we had two statements that he made that we thought untrue under oath that he either lied about or seriously called into question his memory. And the first was he blurted out he was threatened last night outside the presence of the jury. He said that he only expressed a concern that the gentleman who had made a remark to him was in the courtroom. That's one. The second one, and this is at the record at WER 1863 and WER 1920, in the morning the prosecution let him in because the night before he was sweating on the stand, he looked nervous, he was picking at his face, and they let him to say that he was sweating because of epilepsy. But in that hearing outside the presence of the jury, he testified very clearly that the sweating was not due to epilepsy. So we had two very clear impeachment things that either went to his memory or his veracity, and the district court totally precluded us from cross-examining him based upon those statements outside the presence of the jury. Finally, there was an issue with respect to OxyContin. On the federal body wire, he made some comments to Mr. Witzow that implied that he was willing to distribute OxyContin, which would be a felony, to Mr. Witzow. And Mr. Witzow said, no, no, no, I don't want the OxyContin, but this is potential misconduct by an informant or cooperating witness while they're in the act of being a cooperating witness. It also shows the motive of this person to maybe try and get Mr. Witzow in trouble because had Mr. Witzow said, oh sure, I like OxyContin, please get some for me, you know the government would have tried to use that against him. Isn't this, isn't the OxyContin use really a Rule 403 issue? I mean, I understand why you think it's probative. I look at what the lower court judge did here, and I mean the implication is this is a drug user, drug dealer. I mean, I can see how the court in weighing the probative value against the prejudicial value would have kept the OxyContin out. Justice Christensen. I mean, it's a discretionary issue. Let me agree with you on that. I mean, I understand we're talking here about the right of confrontation. Let me agree with you on that in the normal case, but not in this case. And the reason not in this case is there were five to seven hours, multiple interviews with this witness and FBI and the prosecution, and we got no substantive witness statements. How long was Mr. Gillis on the stand during, how long did you, between defense counsel was he cross-examined? I believe over two days he was cross-examined, maybe for a full day, that I can recall because, of course, there was a disruption that took a lot of time away from our actual court time. So I'd say that we got a day. But in the context of not getting any pretrial discovery, not getting this basic Brady material regarding the cooperation benefit, and then, you know, really, I mean, we were developing our cross-examination in the middle of his examination. That's where we were getting the statements from, and that's just too far behind the starting line in a criminal case where people, where their freedom's at stake. So my time is over, so thank you, Your Honor. If you'd put 11 minutes on the clock, we'll pretend that you took only nine. Thank you, Your Honor. And which are the issues you're going to cover? I'm going to discuss the closing error argument in this case. My name is Lillian Chu on behalf of the appellants. May it please the Court. In our jurisprudence, confession is a special word. In this case, where reasonable minds could differ on the interpretation of the evidence, the government unfairly tipped the scales towards conviction by falsely asserting that Mr. Witzow had confessed to the crime of bribing a public official. The government's characterization here was both a misstatement of fact and a misstatement of law. So what did the government actually say? The government actually stated that there is a key fact, and I can actually have this right here. The government actually stated, Creative inferences was once again the somber bottle, which once again cannot be reconciled with the evidence that ignores the key facts. First of all, Mr. Witzow's own confession. And then the government proceeds to use statements of Mr. Witzow and leverage them into a confession when these statements were at best admissions to something. My problem with your argument is that as lawyers, we will sometimes be quite careful in distinguishing between what constitutes a confession and what constitutes an admission. Lay people don't have that distinction in mind, and indeed from time to time lawyers don't either. But I'm trying to figure out what the impact is on the jury of hearing, well, he confessed to this, he confessed to that, meaning he admitted to this unfavorable fact, he admitted to that unfavorable fact. I'm trying to figure out how harmful that is when this is addressed to a lay group and they're not given a sort of legal definition. Confession means he's confessed to the crime because they're not told that. And it's pretty clear from context that what he's, quote, Your Honor, I think the first thing to realize here is that confession is a special word and it means something not just in the legal sense, but it means something in the minds of a jury. When you think about your average individual who is watching television, when they think about what confession means, they're thinking that this is a formal admission to the crime, a confession to all the elements of the crime, which is what we understand the legal definition to be. But didn't Judge Guilford solve the problem when he gave the instruction to the jury to look at the evidence and if you think his word confession accurately describes it, well, remember that Mr. Julian believes confession also has a more formal definition. Did he solve the problem? No, Your Honor. Although I think that the court recognized that there was harm caused by the government's misstatement here, the instruction, the court issue did not go far enough. Well, you wanted an instruction that said that nobody made a confession to a crime in this case. Correct, and that's an important part of what that instruction should have done to cure the harm because confession here would have meant they confessed to the crime charge, which is the crime of bribery, whereas, you know, the instruction suggested the jury can use, make a reasonable inference, but you have to remember that this was said with the weight of the government, the authority of the government, that there was a confession to this crime. It was said during the very last moments of trial with no chance for the defense to present any kind of counterargument. The prosecution asserted this extremely strongly, calling it a key fact, calling it powerful evidence, stating it seven times in quick succession, and so with all of that, you know, the government with its weight and its authority was basically taking the jury's, you know, normal common sense away and allowing the government's own judgment to substitute. The government was well aware that there is no confession in this case or even a strong inference of confession because if the government believed that... Confession as you would define it as confessing to the crime. I'm sorry, confession to the crime of bribery. Yes. And if the prosecutor generally believed that there was a confession to the crime charged here, the prosecutor would have asserted it from opening statement throughout the trial. Mr. Woodson... Now you're just going over your four minutes. Okay, I'm going to actually go ahead and stop so that I can allow my colleague to come up. Thank you so much. Thank you. Let's put seven minutes on the clock and pretend that only four minutes were used. May it please the court. Thank you, Your Honor. Your Honor, I will be addressing... My name is Firdaus Doherty, and I'll be addressing the brutal violation with respect to Mr. Vigil and the instructional error with respect to both appellants. With respect to the brutal violation, the impact of the use of the word confession at the end is obviously significant. But going back to the testimony, initially we have the testimony of two Orange County district attorneys that indicate they had conversations with Mr. Vigil about the statement that Mr. Gillis is a DEA informant. Then we have Special Agent Murray testifying that Mr. Witso made certain statements, and in connection with those statements, the existence of Mr. Vigil is unavoidable. And I think that the critical case to look to in that context is the Mayfield case that this court decided, where there was a similar situation where there was a detention and someone indicated specifically by name but then said that that is the main man, the main man who is providing him drugs. And what the prosecution did was they took out the specific reference to Mayfield that Mr. Gilbert in that case had made and used the words main man, and then subsequently, in connection with the statement, it made very clear through the statements of Mr. Gilbert's counsel that effectively main man referred to Mr. Mayfield. And here what you had was very similar in the context of what the Orange County DAs testified to, and then Agent Murray getting up and providing testimony that made it very clear that the whole story was fabricated. When the person who provided that story to the Orange County DAs in a case where the issue with respect to both conspiracy and the substantive crime is bribery of a public official, that the person who's providing that is Mr. Vigil. Counsel, does your argument that you're making, does it depend upon the existence of an actual Bruton agreement? I mean, we've got this argument here that this Bruton memo was actually not an agreement, it was just negotiation. Does your argument depend on whether there is or isn't an agreement? No, Your Honor, but I think the stipulation issue is significant because it ties in. As I read it, there was no stipulation. There was an agreement we would talk about a stipulation, but I see no stipulation. But, Your Honor, it was placed on the record that the attachment to the email that government counsel had provided to defense counsel was going to be essentially what the parties agreed to. That was provided to Judge Guilford. Judge Guilford looked it over and said, you know, we're all in tune on this. And at that point, government counsel said yes. So it was clear that everybody understood that those were the parameters of Bruton that were being proceeded on. But, Judge Christensen, in responding to your argument, my specific argument with respect to Bruton is not dependent on that. That's what I thought. Mine is dependent on the Supreme Court's decision in Gray, which talks about the existence of the individual, and then beyond that, the Ninth Circuit's decision in Mayfield. But I would like to touch upon the stipulation issue because it kind of goes back to the whole issue of the government now contends that there was none. There was no stipulation. But it's very clear from the record that the court asked about it. The attachment was examined. The parties indicated that that's what they were proceeding on. And that statement in terms of how it was framed came back with respect to the amount at issue in terms of the $2,500, which in a case where you're looking at the offense being bribery of a public official, if Witsow's statement to the $2,500 comes in and the whole story being fabricated applies to the statements Mr. Vigil made to the Orange County DAs, it's pretty clear that there's nobody else that could have potentially made those statements in terms of the impermissible inference coming in. So this case should have been severed for that reason. And very briefly, with respect to the instructional error argument. We're talking about jury note number two? Absolutely, Your Honor. So with respect to jury note number two, the jury expressed clear, explicit confusion with respect to the conspiracy instruction in two parts. And each party provided its response to that. In fact, I think Ms. Bird even said that why don't we provide both responses as a resolution for it? And at that point, the court's response was to review all of the instructions, which was about 65 pages, without any kind of effort to clarify that. And the inconsistent verdict with respect to count three shows that the jury doesn't seem to ever resolve that confusion. Thank you, Your Honor. Thank you. Let's hear from the government. Your Honors, good morning. Rob Keenan for the United States. I wanted to first thank you for advancing the hearing so I could attend today. The United States Attorney's Office, and me as well, take claims of prosecutorial misconduct very seriously. And I want to address those claims primarily, and if time permits, then address the two other rulings, the evidentiary ruling and the jury note two. There was no misconduct here on any of the claims. The defendant's grouping of the claims together doesn't make them any more strong, individually or collectively. I'll address the arguments in the same way that the defense has presented them here this morning, as to the Brady claim. The answer is, according to the test to Your Honor's question, whether there was an agreement there. The government has never received a copy of any document suggesting there was any sort of an agreement between the Orange County District Attorney's Office and Wayne Gillis, the C.I. in our case. According to the testimony of Daniel Hess and our pretrial meeting with him, there was no communication with Wayne Gillis' attorney because he was the subject, Mr. Witzow, was the subject of the investigation. They couldn't do a deal with him in writing. But they could do a deal with Gillis. Correct. But according to Daniel Hess, the supervisory DA, deputy DA, he didn't have any communications with Mr. Gillis or anyone from his office. That was the gist of his testimony. So there was no agreement with him at all. Basically, the testimony, it's all consistent between the C.I.'s testimony, the testimony of the FBI agent, Jesse Murray, and the testimony of Daniel Hess. Basically, there was no agreement. The difficulty in cross-examining Mr. Gillis that Mr. Julian noted here is simply a function of the fact that he didn't have any personal knowledge of the communications he was being asked about. He didn't know about the decisional process of the District Attorney's Office. He had no communications with him about that. So from his personal knowledge, he simply said, not that I know of. I can't testify to that as a fact. But what was clear is what we disclosed. We disclosed that Mr. Gillis was a co- These are historical facts, not some benefit that might be obtained by the witness, Mr. Gillis, down the road if he testifies in accordance with the government's best wishes. It's a historical fact. He was cooperating with the government. It was disclosed in the indictment and in all of the discovery. It is a historical fact that as a result of his cooperation with the District Attorney's Office and the FBI that he received a benefit, namely the dismissal of his case. The fact that there were no discussions between the District Attorney's Office and Mr. Gillis is really a side point and doesn't get to the question about whether he could be cross-examined effectively on that basis. Frankly, his lack of knowledge regarding the District Attorney's Office basis for dismissing the case was used by the defense in their closing arguments to suggest he was being evasive and shifty and couldn't be trusted on that ground as well as many others. Was it disclosed that the charges had been dismissed against Mr. Gillis due to his cooperation? Was that disclosed? I mean, you're talking about historical facts, which gets to the sort of it's implicit or they should have known. But was it actually disclosed? I believe it was effectively disclosed by disclosing the fact he was a cooperator and the fact that... No, not effectively. Was it expressly disclosed? I looked through the government's discovery letters and any available e-mails that I could find, and I found no e-mail or letter that said, just so you know, I want to diagram these two points, that the cooperation is related to the fact that the state assault case was dismissed. Okay, so let's, Mr. Keenan, let's just assume that the first element is satisfied, that the charges, in fact, were dismissed against Mr. Gillis due to his cooperation. The second element is satisfied because the government did not disclose this information expressly as opposed to effectively. So then the question becomes, as I look at this and think about it, is was there any prejudice here? And that gets to your effective argument, I guess. It does, but it also gets to the question of whether the... Well, I just heard them say they didn't know it. They suspected it, and anyone would suspect it. But they say they didn't know it. I heard that true, too. But there's a big difference between suspecting it and being able to mount a full-throated cross-examination of a witness that has gotten a cooperation agreement.  I would. I would. I don't admit that. The two facts they needed to know in which they made... Let's take the instance of a 5K1.1 agreement. They might suspect that a cooperating witness that comes in to testify has gotten some benefit, but isn't it a lot more effective in cross-examining that witness to have that document in front of you and know what the deal was, what sort of benefit that witness received? The point is, there was no deal struck between them. I don't... Well, the deal was that if he cooperated, the charges against him were dismissed. That's just what you said. That was the deal. My point was, the testimony makes clear the district attorney's office had no negotiations with Mr. Gillis where they struck any such deal. It was a natural byproduct of the investigation that if the district attorney's office wanted to take the case, take this out and assist the FBI in its investigation of the bribery case, that the case would have to be dismissed, the case against Mr. Gillis. Because at that point, if it were disclosed before that time to the subjects of the investigation, there would be no payment. It was a natural byproduct of the investigation. And there was no deal. There was no deal. He sort of went along, he cooperated, and then at the end of the day, the charges were dismissed. Correct. There was hope on his side. I think he admitted as much in his testimony on cross-examination. He hoped for the best, but he didn't have any promise to that effect. And the bottom line is, what the jury heard is that as a result of his cooperation with the FBI, the state dismissed the assault case. So they knew about the benefit. And in answer to the court's earlier question about the effectiveness of the disclosure, we know from the record, it's not my supposition, on the day before trial, Mr. Witso's counsel, Mr. Julian, according to the docket sheet, personally filed a set of proposed jury instructions, one of which included an instruction that said Mr. Gillis was, quote, a cooperating witness, unquote, who, quote, had received benefits from the government in connection with this case. Was that instruction given in this case? I believe it was. I'd have to double-check, but I believe so. During voir dire, Mr. Julian again himself told the prospective jurors that Mr. Gillis was, quote, a cooperating informant, in brackets, who was trying to get out from under, in brackets, the state assault case, unquote. In his opening statement, Mr. Julian again told the jury, the panel jury, that Mr. Gillis' motive for cooperating with the FBI was to get out from under the state assault case. The notion that they didn't know, that they were confused, well, maybe just the deal was that it was going to be dismissed just in exchange for a simple provision of a DNA sample, is frivolous on its face. It's not true. Now, as to the confession argument, the facts of this case, the record that I was relying upon, amply support the government's argument that the use of the word confession is part of its closing argument. I'm not sure they really do, but trying to be careful with your words, I would strongly recommend in that circumstance you say admit. I probably will in the future. It avoids all sorts of issues, but this issue is not a legitimate, the claim of error made here by the defense on this record is not valid. Under the law, not just the dictionary definition of the word confession, section 3501 refers to it as a confession of guilt to an offense, or any self-incriminating statement, unquote, in the upper decision. Self-incriminating statements, that sounds as though we're confessing to a crime, as suggested by the word incriminating. Well, my point is simply, the alternative disjunctive approach, a full confession to the offense, or a self-incriminating statement, suggests to me something less than a full confession. Mr. Sweeney, I think Judge Guilford was concerned about the use of the word confession, and that's why I think he invited and received alternative instructions, and instructed the jury on this issue. Following up on my question to Mr. Julian, was the instruction that Judge Guilford gave on this subject, in your opinion, adequate, and why? It was more than adequate. It told the jury repeatedly that arguments of counsel are not evidence. There's a general instruction on that, I'm sure he gave that at the beginning and end of the trial. Correct, and then there was a special one, it wasn't to the defense liking, but there was a special one where he said, essentially the parties disagree as to the use of the word confession. You've heard that. Essentially, I'm not quoting here, but disregard the government's characterization of it, and look at the evidence they're characterizing. That's what he said. And that your assessment of the evidence controls. Actually, I think that last part was exactly what I told the jury immediately after this issue became an issue during my rebuttal argument. I specifically told them, your assessment of the evidence controls. And that's what the district judge did as well in his jury instructions. But back to the definition of confession, it also includes under the upper decision, the Supreme Court decision, an admission of guilt of the charged crime or, quote, some essential part of it, unquote. I'm sorry to go back to this, but I have the language here in front of me that Judge Guilford utilized on the subject of confession. And I can't remember from the record, did he put this into the form of an actual instruction or was this something he said to the jury at a certain point in time? What's your recollection on that? My recollection is he wrote it out in chambers and typed it up. And I believe it's an instruction. I believe so. Okay. And the courts have approved the use of the word confession in several other districts. We've cited them. So what are the facts? When the FBI went to interview him at Mr. Witzow's office, they played about a seven-minute tape containing various excerpts of his statements to the CI where he mapped out the bribery scheme for the CI. And then once the recording was over, according to the agent's testimony, he was defeated, he had his hand to his head, and he said, quote, I screwed up. No, it was a stupid thing to do, and I screwed up. He then proceeded during the course of the remainder of the conversation to admit that he knew Mr. Gillis was not a DEA informant, that he knew the whole story was fabricated, and as to the $2,500 fee, he admitted that Gillis was charged that in exchange for presenting the false story to the district attorney's office. I think reasonable inferences from that testimony, which is exactly what the agent testified to, provide an ample basis for my use of the word confession. There's another sort of part of their closing argument, claim of error relating to that, they argue that the government misstated the Witsow's statements regarding the criminal stuff being not tax deductible. Again, my argument on that point was based directly on the CI's testimony that he said that comment about criminal stuff not being tax deductible was a direct reference to the $2,500 bribery payment. I was looking at it last night, there are actually other pages that exhibits 1A and exhibits 2A, those are the first two recorded telephone calls between the CI and Mr. Witsow. In both of those recordings, pages 2600 to 2604, 2610 and 2616, Mr. Witsow is asked, the CI asks him, so this $2,500, what are we talking about, what is exactly that for? And he says, that's not coming to me, that's not for my fee, that's to see what other people can do for you. He said he didn't want to be too clear on that point. But the bottom line was he admitted in those statements to the CI that the $2,500 wasn't for attorney's fees. And so the defense argument here that I misstated the evidence because I didn't accept the false cover story that the defendants created to cover for their bribery scheme is I think a bridge too far. I shouldn't have to accept their false cover story to avoid claims of misconduct in a closing argument. Time is short, so let me address the Bruton claim. Prior to trial, as that email that's characterized as a stipulation suggests, I was mindful of Bruton and wanted very much to avoid a Bruton violation. That was the whole point of that one email. I wanted to make sure everybody was on board and so that a mistrial wouldn't result. It was also, I think, concerned not just about the government avoiding that. I wanted to make sure Mr. Witzow's lawyers were aware of the issue and aware they could also violate Bruton, and I didn't want that winding up with a mistrial as to Mr. Vigil in two different trials. That was the whole point of that. I wasn't attempting to impose any additional limitations, as the stipulation issue, upon the government's ability to present its evidence, incriminating evidence against Mr. Witzow. I wanted to avoid a Bruton violation. But the correspondence, which is ignored in both the opening brief and the joint reply brief, proves that my email was not a formal stipulation where I was crafting a well-crafted document limiting what I could and could not do. It was for discussion purposes. That's why I forwarded that email with the highlighting on it. It wasn't to suggest that everything in the highlighting was out of bounds. It was simply to suggest that these are the sentences that we need to be worried about because they make reference to Vigil, and so this is what we ought to be talking about. Now, as to the basic point was, as to the court, during the middle of trial, Mr. Julian presented that in the form of a stipulation. He did not present the email itself that they claimed to be the stipulation. He presented the attachment to it, the one-page memo with the highlighted sentences. And that's the document on the record that I say I prepared. And what is ignored, they quote to it and then ignore it. So it's in the joint reply brief. But what I said on page 1259 of the record is I made crystal clear I was going to ask the very question that is the subject of two or three of the claims of error here. I said that I was going to ask him, Agent Murray rather, about the $2,500 fee on 1259. I made that crystal clear. There was no objection from the defense counsel at that time or at any other subsequent time during the trial. If there had been a stipulation and they knew there wasn't one because we hadn't reached one. But if there had been a stipulation they would have presumably presented that to the court and objected to my clear qualification. They want to pretend simply that that clear statement by me didn't happen or had no legal significance. The bottom line is they were aware of it hours before I asked that one question. So there is no brutal violation as to that particular question because it made no reference to Mr. Vigil. Didn't make reference to him as a pronoun. Didn't make reference to him by his own name. Didn't make any reference to a third party at all. The specific question was during the course of your interview of Mr. Witso, did Mr. Witso admit that Wayne Gillis was charged a fee of $2,500 in exchange for the false story presented to the OCDA? Answer, yes. And then I moved on. There's no reference to Vigil there. There's no powerfully incriminating reference to him at all. Well, there's no reference to him at all and certainly none that could be characterized as powerfully incriminating. You're at your time. Oh, I see that. So thank you very much. Thank you. Three minutes, please. Justice Fletcher, in answer to your question, I think it's very well understood from a lay person who watches law and order. If I were to ask my mother or my neighbor what it means when a defendant has confessed, that's the part of the show when he's in there for two hours with the investigator and then he admits that he committed the crime. And I think the jurors would have understood it that way. And I think that the government had a strategy here because normally the U.S. attorney says a person committed a statement and that matches an element of the crime and they argue beyond a reasonable doubt. To say that seven times, they were trying to take a shortcut with this jury and it was a very prejudicial shortcut because what it told the jury was the case is over. You don't have anything to decide. He had a verdict, which is inconsistent with the verdict on Mr. Vigil. That was the strategy. There's nothing else to be decided here. How long did the jury deliberate? They deliberated over three days, Your Honor. Maybe two full days over the three days. And I would like to also hit real quick on the idea that the conversations that the OCDA had or didn't have with what is in the record is that Mr. Gillis was represented by his own counsel, Jason Lamb in Arizona. So once this became an FBI operation, it was actually Mr. Lamb and Mr. Gillis who made the first recording of Mr. Witzow and they brought that to the FBI. And so those conversations may well have occurred. And so Mr. Lamb had contact with the FBI. Mr. Lamb had contact with the OCDA's office. So there was another attorney involved. And the government has an affirmative duty here for a federal cooperating witness in a federal investigation that is jointly being helped by the OCDA's office to know that there's a deal and to explicitly disclose that to us. And we were clearly prejudiced by that clean cross-examination that we were not able to do here. The other thing that I wanted to say really quick also was that this idea, going back to confession, that Mr. Witzow said it was a stupid thing to do after listening to the CD. We would submit that the CD doesn't say the word bribery on it. It doesn't contain all the elements of the crime. And in fact, a lot of the things said on the CD are either... Going back to the question of confession. It is, yeah. The things said on the CD are either ambiguous in and of themselves or they're ambiguous in the context of the whole case. So for Mr. Witzow to fess up and say, yeah, that was a stupid thing to do. That was, you know, I screwed up. That's not a confession of the crime of bribery. And it shouldn't have been argued that way to the jury. And the government's own witness, Special Agent Murray, testified she understood him to be talking about what was a really stupid thing to do, and that was lying to the DA. And so I think the government stretched that too far and prejudiced us. On the issue of... It's time to sum up. Sum up. I would invite the court's attention also to the Jenks violation in this case. I think it was very clear to Mr. Gillis that he made that together with Mr. Keenan so that they could get their minds clear. That also rings Brady in this case because he had memory problems. Thank you so much for your time today. Thank you.
judges: Christensen, Fletcher, Gould